

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
09/24/2008

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **BLAST ENERGY SERVICES, INC.** | § | **CASE NO. 07-30424-H4-11** |
| | § | |
| **EAGLE   DOMESTIC   DRILLING** | § | **CASE NO. 07-30426-H4-11** |
| **OPERATIONS, L.L.C.,** | § | |
| | § | **Jointly   Administered   Chapter   11** |
| | § | **Under Case No. 07-30424-H4-11** |
| *Debtors* | § | |

**MEMORANDUM OPINION ON DEBTORS' EMERGENCY MOTION FOR ORDER TO**
**ENFORCE ORDERS CONFIRMING PLAN AND APPROVING COMPROMISE OF**
**CONTROVERSIES AND, IN THE ALTERNATIVE TO SHOW CAUSE WHY EAGLE**
**DRILLING, LLC SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING SAME**
[Docket Nos. 930, 932]

### I.     Factual Background

The parties to this dispute are: (1) Eagle Domestic Drilling Operations, L.L.C. (EDDO);

(2) Eagle Drilling, L.L.C. (Eagle); and (3) Hallwood Petroleum (Hallwood).

Hallwood and Eagle entered into two IADC drilling contracts concerning certain oil and

gas wells in Oklahoma (the Contracts).  On August 25, 2006, Eagle assigned all of its rights

under the Contracts to EDDO, except that Eagle retained title to all accounts receivable existing

as of August 25, 2006.  In exchange for the assignment, EDDO, among other consideration, paid

$750,000.00 to Eagle.

On January 19, 2007, EDDO filed a voluntary Chapter 11 petition in this Court.[1] [Docket

No. 1.]  On February 26, 2008, this Court confirmed EDDO's plan of reorganization (the Plan).

[Docket No. 873.]  During the approximately one-year period between EDDO's filing of its

petition and the confirmation of the Plan, there were certain lawsuits that were filed in, or

---

[1] On August 24, 2006, ownership interests in EDDO were sold to Blast Energy Services, Inc. (Blast),
EDDO's current parent company.  Both EDDO and Blast filed their respective voluntary Chapter 11 petitions in this
Court on January 19, 2007; their cases have been jointly administered under Case No. 07-30424.

removed to, this Court. One of these suits was between EDDO and Eagle. This suit involved a contest over which party owned title to certain rigs and related equipment. The litigation was extremely acrimonious and consumed substantial time in this Court. Eventually, however, the parties negotiated a settlement, which this Court approved on May 11, 2007 (the Eagle Settlement). As part of the Eagle Settlement, EDDO and Eagle executed joint and mutual releases. Along with more specific release provisions, the Eagle Settlement includes "a release of any and all liens, claims, and encumbrances on the respective parties' properties or estates." [Docket No. 402.]

A second lawsuit pending before this Court prior to confirmation of the Plan was a dispute between EDDO and Hallwood. This dispute concerned Hallwood's termination of the Contracts and the amount owed to EDDO as a result of the termination. As of the date that this Court confirmed the Plan, this suit was still pending. Indeed, in its disclosure statement, which this Court approved on the record at the hearing held on September 26, 2007, EDDO represented to its creditors that, as part of the Plan, EDDO would prosecute this suit in order to generate cash to pay claims.

Once this Court confirmed the Plan, EDDO did in fact vigorously prosecute this suit. In April of this year, EDDO and Hallwood announced to this Court that they had negotiated a settlement (the Hallwood Settlement). Under the terms of the Hallwood Settlement, Hallwood is to make an aggregate payment to EDDO of $2 million in exchange for a complete release from EDDO. The first payment of $500,000.00 was due to be paid on July 1, 2008.

Approximately one week after this Court approved the Hallwood Settlement, Eagle—which itself had filed a Chapter 11 petition in the United States Bankruptcy Court for the Western District of Oklahoma—filed a motion for leave of that court to file an amended

complaint against Hallwood (the Motion for Leave).[2]   Attached to the Motion for Leave was a copy of the amended complaint which Eagle seeks permission to file.   The additional claim asserted by Eagle against Hallwood in the putative amended complaint is the same claim that EDDO asserted against Hallwood in this Court.

Specifically, Eagle asserts in the proposed amended complaint that Hallwood owes it monies due to Hallwood's termination of the Contracts.  Eagle contends that (1) since it assigned its rights under the Contracts to EDDO (except the accounts receivable) on August 25, 2006, Eagle has obtained information which proves that Hallwood terminated the Contracts prior to August 25, 2006; (2) because Hallwood terminated the Contracts prior to August 25, 2006, the monies owed as a result of the termination constitute an account receivable that was in existence as of August 25, 2006; and (3) since these monies constitute an account receivable as of August 25, 2006, Hallwood owes these monies to Eagle and not EDDO.[3]

After Eagle filed its Motion for Leave in the Oklahoma bankruptcy court, Hallwood informed EDDO that Eagle's pleading put the Hallwood Settlement in jeopardy.  Hallwood informed EDDO that Hallwood did not want to pay the $2 million to EDDO for a release that would be rendered worthless if Hallwood had to spend time and money defending itself against Eagle's claim in the Oklahoma bankruptcy court.   In short, Hallwood was conveying the following message to EDDO: Hallwood settled with EDDO out of a good faith belief that EDDO owned the claim, but if Eagle owns the claim for termination of the Contracts, then Hallwood does not want to perform under terms of its settlement with EDDO.

---

[2] Eagle was already prosecuting a suit against Hallwood in the Oklahoma bankruptcy court.

[3] In effect, Eagle's position necessarily leads to the conclusion that EDDO paid $750,000.00 for terminated contracts.

## II.   **Procedural Background**

On May 18, 2008, EDDO, out of fear that Hallwood would not make all the payments to EDDO under the Hallwood Settlement, filed a Motion for Contempt against Eagle (the Motion). [Docket No. 930.]  EDDO seeks an order from this Court declaring that Eagle holds no claim against Hallwood for termination of the Contracts and that Eagle is in contempt of this Court's prior orders by attempting to assert such a claim in the Oklahoma bankruptcy court.  EDDO asserts that the prior orders of which Eagle is in contempt are (1) the order approving the Eagle Settlement; (2) the order approving the Hallwood Settlement; and (3) the order confirming the Plan (hereinafter referred to as the Prior Orders).

EDDO also asserts in the Motion that Eagle is interfering with EDDO's effectuation of the Plan because (1) Eagle, in filing its Motion for Leave, is seeking to assert a claim that EDDO owns; (2) by so doing, Eagle is jeopardizing the Hallwood Settlement, a settlement that arose out of EDDO's prosecution of the suit pursuant to the Plan; and (3) by so doing, Eagle is disregarding the Eagle Settlement which this Court approved and which was expressly incorporated into the Plan.  Indeed, EDDO points to the language in the joint and mutual release and asserts that Eagle released any and all claims, liens, and interests that Eagle has, whether known or unknown, on EDDO's assets.  By seeking leave of the Oklahoma bankruptcy court to amend its complaint against Hallwood, EDDO contends that Eagle is violating the release because Eagle's Motion for Leave constitutes Eagle's assertion of a claim, lien, or interest on an asset of EDDO, namely, the claim that EDDO has settled with Hallwood for $2 million.

Finally, EDDO emphasizes that Eagle participated in EDDO's plan confirmation process in this Court, and that Eagle has knowledge of the following: (1) EDDO's scheduling of its claim against Hallwood for termination of the Contracts; (2) EDDO's disclosure statement, which

4

expressly represented that EDDO held a claim against Hallwood, that this claim represented an asset that EDDO would liquidate to pay allowed claims under the Plan, and that EDDO would prosecute this claim after confirmation of the Plan; and (3) this Court's confirmation of the Plan revested title to the claim in the reorganized EDDO, and that EDDO has had the right to prosecute and settle the claim.  EDDO argues that Eagle, by not objecting to either EDDO's scheduling of its claim against Hallwood, or EDDO's disclosure statement, or EDDO's Plan, is estopped from now taking the position that it owns any claim against Hallwood for termination of the Contracts.

On May 20, 2008, Eagle filed a Response to the Motion (the Response). [Docket No. 940.]  Eagle asserts the following defenses: (1) this Court has no jurisdiction because the amended claim that Eagle seeks to file against Hallwood is a prospective suit that does not involve the debtor in this Court (i.e. EDDO); (2) even if this Court has jurisdiction, the relief requested by EDDO requires the filing of an adversary proceeding with proper service of process, and EDDO has failed to comply with these procedural requirements, thereby depriving Eagle of due process; (3) even if this Court has jurisdiction and no adversary proceeding is required (i.e. the Motion is procedurally sufficient), the Motion is not yet ripe for adjudication because the Oklahoma bankruptcy court has not yet ruled on Eagle's Motion for Leave; and (4) assuming that the matter is ripe for adjudication, the evidence reflects that Hallwood terminated the Contracts prior to August 25, 2006 and that, therefore, the monies owed as a result of this termination constitute an account receivable owed to Eagle, not EDDO.

As for EDDO's assertion that Eagle, by filing the Motion for Leave, has violated this Court's Prior Orders, Eagle responds that it has done no such thing.  Eagle asserts that because Hallwood terminated the Contracts prior to August 25, 2006—thereby making any monies owed

an account receivable as of August 25, 2006—Eagle has always owned this claim; therefore, Eagle has done nothing to violate the Prior Orders. Rather, Eagle is now merely seeking to assert a claim against Hallwood which Eagle has always owned—it just did not know it until recently because it did not have the evidence necessary to demonstrate that Hallwood terminated the Contracts prior to August 25, 2006.

After Eagle filed its Response to the Motion, this Court scheduled a hearing on the Motion. Hallwood intervened in support of the Motion. This Court, rather than holding an immediate hearing on the merits, gave the parties approximately four weeks to conduct discovery. During the ensuing four-week period, the parties produced documents to one another, and Eagle took six depositions of certain officers and employees of Hallwood. This Court then held a hearing on the merits on June 20, 2008. At the conclusion of the hearing, this Court took the matter under advisement.

After the Court took the matter under advisement, the first payment under the Hallwood Settlement became due on July 1, 2008. On July 8, 2008, Eagle filed a notice to the Court asserting that Hallwood, in fact, had made this payment of $500,000.00, and that, in the wake of Hallwood performing, in part, under the terms of the Hallwood Settlement, the Motion had become moot. [Docket No. 975.] Essentially, Eagle posits that the very basis of the Motion— that EDDO is worried that Hallwood will not perform under the terms of the Hallwood Settlement—is misplaced because Hallwood has in fact begun performing. Additionally, Eagle added another defense by contending that EDDO's Motion for Contempt constitutes a violation of the stay in Eagle's Oklahoma Chapter 11 case.

The Court will address all of the arguments described above in this Memorandum Opinion.

6

### III.    Jurisdiction

This Court confirmed the Plan on February 26, 2008.  EDDO filed the Motion on May 13, 2008.  Therefore, the dispute before this Court arose post-confirmation.  In the Fifth Circuit, a bankruptcy court's jurisdiction to resolve post-confirmation matters is narrower than its jurisdiction to resolve pre-confirmation disputes.  *See In re U.S. Brass Corp.*, 301 F.3d 296, 301 (5th Cir. 2002); *In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001).  However, the Fifth Circuit recently clarified its prior decision in *Craig's Stores*, which limited a bankruptcy court's jurisdiction over post-confirmation disputes to "matters pertaining to the implementation or execution of the plan."  *Id.* at 390.  The Fifth Circuit explained that the bankruptcy court retained limited post-confirmation jurisdiction in *Craig's Stores* because (1) the claims at issue "principally dealt with post-confirmation relations between the parties"; (2) "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization"; and (3) "no facts or law deriving from the reorganization or the plan [were] necessary to the claim."  *See In re Enron Corp. Sec.*, 535 F.3d 325, 335-36 (5th Cir. July 10, 2008) (citing *Craig's Stores*, 266 F.3d at 391).  Conversely, bankruptcy courts generally retain jurisdiction over *pre-confirmation* claims based on *pre-confirmation* activities even though the actual dispute is tried post-confirmation.  *See id.* at 335-36.

Here, although the dispute arose post-confirmation, the claims against Hallwood, regardless of whether these claims are owned by EDDO or Eagle, arose pre-confirmation.  Thus, the claims at issue primarily deal with pre-confirmation relations between the parties (i.e. between EDDO and Hallwood, and between Eagle and Hallwood).  Moreover, the Eagle Settlement, which was negotiated and approved pre-confirmation, necessarily involved the claims against Hallwood; thus, the dispute at issue between EDDO and Eagle primarily is

7

concerned with pre-confirmation relations between EDDO and Eagle.   Indeed, there was substantial antagonism between EDDO and Eagle prior to the date that the Plan was confirmed, as the two parties were involved in prosecuting claims against one another in an adversary proceeding in this Court.   There was also substantial antagonism between EDDO and Hallwood prior to confirmation of the Plan.   And, finally, there was substantial antagonism between Eagle and Hallwood pre-confirmation.   Under all of these circumstances, this Court has jurisdiction over the matters contained in the Motion pursuant to *Enron Corp. Securities*.[4]   Additional case law discussed below further supports this conclusion.

## A. Six factor Test for Post-Confirmation Subject Matter Jurisdiction

In *In re Encompass Services Corp.*, this Court applied a six-factor test for determining whether a bankruptcy court has post-confirmation jurisdiction over a matter pursuant to the Fifth Circuit's holdings in *Craig's Stores* and *U.S. Brass*.   *In re Encompass Servs. Corp.*, 337 B.R. 864, 873-77 (Bankr. S.D. Tex. 2006).   Based on the combined opinions of *Craig's Stores* and *U.S. Brass*, this Court found the following inquiries relevant to post-confirmation subject matter

---

[4] Even if *Craig's Sores* applied and the Court's jurisdiction were limited to matters relating to implementation or effectuation of the Plan, this Court would still have jurisdiction because it is being asked to declare EDDO's ownership rights and entitlements under the Plan.

Eagle nonetheless argues that the Eagle Settlement is not part of the Plan because the Plan does not mention the Eagle Settlement specifically (though its terms are incorporated in the Plan).   Although Eagle admits that the Eagle Settlement waived Eagle's claims against EDDO, Eagle argues that it did not waive any claims against *Hallwood*. Therefore, Eagle argues, its attempt to sue Hallwood in the Oklahoma bankruptcy court for termination of the Contracts prior to August 25, 2006 has no bearing on the interpretation or effectuation of the Plan.

However, by seeking to sue Hallwood in Oklahoma, Eagle will likely cause Hallwood to renege on the Hallwood Settlement, which would greatly affect the implementation of the Plan.   That is, Hallwood, not wanting to pay $2 million to settle with EDDO only to then have to defend itself against Eagle, will likely withdraw from the settlement with EDDO and seek to consolidate the EDDO/Hallwood suit with the Eagle/Hallwood suit (assuming the Motion for Leave is granted by the Oklahoma bankruptcy court).   Such a scenario would significantly harm the effectuation of EDDO's Plan because, having represented to its creditors that it would liquidate its claim against Hallwood, and having done so to the tune of $2 million, Hallwood's withdrawal would deprive EDDO of $2 million in assets and would force EDDO to litigate not only against Hallwood, but with Eagle over who is entitled to monies due to Hallwood's termination of the Contracts.

This Court concludes that Eagle's attempt to sue Hallwood directly affects EDDO's effectuation of the Plan.   Accordingly, this Court has jurisdiction over the issues described in the Motion.

jurisdiction: (1) when the claim at issue arose; (2) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying these suits; (3) whether the plan has been substantially consummated; (4) the nature of the parties involved; (5) whether state law or bankruptcy law applies; and (6) indices of forum shopping. *Id.* at 873.[5]

### 1. When the Claim at Issue Arose

Generally, when the claim arises pre-petition, the bankruptcy court retains subject matter jurisdiction—particularly when the claim has been incorporated into the reorganization plan. *See In re Enron Corp.*, 535 F.3d at 335-36; *In re U.S. Brass Corp.*, 301 F.3d at 299-300. Here, both EDDO's and Eagle's claim relating to termination of the Contracts arose pre-petition. Specifically, any claim for termination of the Contracts arose well before the filing of EDDO's petition on January 19, 2007. [Docket No. 1.] Additionally, EDDO's claim against Hallwood was listed in EDDO's original disclosure statement and is integral to the terms of EDDO's reorganization efforts under the Plan. *See* [Docket No. 467.] *and* [Docket No. 774]. Because EDDO's claim arose pre-petition and was incorporated into EDDO's Plan, this factor weighs heavily in favor of finding that this Court has jurisdiction over the matter.

### 2. The Plan's Provisions for Dispute Resolution and for Retaining Jurisdiction

Although a Plan cannot, by itself, confer subject matter jurisdiction, some courts find that "a plan which fails to retain subject matter jurisdiction may leave it lacking." *In re Coho Energy, Inc.*, 309 B.R. 217, 220 n.4 (Bankr. N.D. Tex. 2004). EDDO's Plan defines the "Hallwood Litigation" as "court proceedings ongoing between Hallwood Energy and Hallwood

---

[5] The Fifth Circuit's recent decision in *Enron Corp. Securities* does not vitiate the need to apply *Craig's Stores* and *U.S. Brass* in evaluating a bankruptcy court's post-confirmation jurisdiction.

Petroleum against Eagle Domestic Drilling Operations LLC pertaining to an early termination and resulting breach of two IADC standard form drilling contracts, and any counterclaims asserted or to be asserted by Eagle." [Docket No. 426, Art. 1.44.] The Plan also provides, under its "Authority to Prosecute or Settle Litigation" section, that "The Hallwood Litigation . . . shall be prosecuted, settled, or compromised as deemed appropriate by the board of directors of Reorganized Blast in an exercise of its business judgment under applicable corporate law." [Docket No. 426, Art. 9.8.] The Plan therefore defines the scope of EDDO's claim against Hallwood and provides for the terms of its resolution.

Further, the Plan expressly provides that this Court "shall retain the fullest and most extensive jurisdiction permissible, including all jurisdiction necessary to ensure that the purposes and intent of the Plan are carried out" and that this Court "shall retain jurisdiction to hear and determine all Claims against and Interests in the Debtors, and to adjudicate and enforce all other causes of action that may exist on behalf of the Debtors."   [Docket No. 426, Art. 13.1.] Therefore, the Plan contemplates that this Court retain jurisdiction to enforce its terms and the terms of both the Eagle Settlement and the Hallwood Settlement.

For these reasons, the second factor weighs in favor of the Court having jurisdiction over this matter.

### 3. Substantial Consummation

There is no question that: (a) property of the estate has revested in the reorganized Debtor; (b) the reorganized Debtor has assumed management of the property that has revested; and (c) the reorganized Debtor has already made payments to many creditors.  Thus, substantial consummation has occurred in this case pursuant to the definition of this phrase under 11 U.S.C. § 1101(2).  Because substantial consummation has occurred, this factor weighs against this Court

having post-confirmation jurisdiction of the matters set forth in the Motion. However, the action taken by Eagle to seek to sue Hallwood in Oklahoma does threaten the complete payment by Hallwood to EDDO pursuant to the Hallwood Settlement, and if this payment is not fully made, then EDDO may have insufficient cash to make payments on all remaining unpaid claims in this Chapter 11 case. Hence, while substantial consummation has occurred and certain creditors have been paid in full,[6] the risk that other creditors have not is a factor that this Court believes should also be taken into account. Accordingly, while the occurrence of substantial consummation weighs against post-confirmation jurisdiction, the risk of Hallwood not paying the remaining $1.5 million in cash to EDDO leads this Court to conclude that the "substantial consummation" factor should not be given the amount of weight that it would otherwise be given.

### 4. Parties Involved

In *Craig's Stores*, the Fifth Circuit explained that post-confirmation jurisdiction was inappropriate in part because the debtor's claim principally dealt with post-confirmation relations between the parties. *In re Craig's Stores*, 266 F.3d at 391. The Court determined that, because the debtor's claims did not "bear on the interpretation or execution of the debtor's plan," they did not fall within the bankruptcy court's post-confirmation jurisdiction. *Id.* Here, the situation is just the opposite. EDDO's request in the Motion is specifically that the Court enforce and clarify the terms of the Plan by declaring the parties' rights thereunder. The relief requested by EDDO is not an attempt to reinstate bankruptcy protection in order to avoid post-confirmation hardship, but rather to clarify EDDO's ownership of a claim against Hallwood and the terms of the Eagle Settlement, both of which were extensively litigated before this Court and were relied upon by EDDO when making its Plan. Therefore, post-confirmation jurisdiction is proper in this case in

---

[6] Unsecured creditors have been paid in full, but certain other claims remain to be paid.

11

order to clarify the terms of EDDO's Plan and the two settlements that form a major basis for those terms.

Under the circumstances described above, this factor weighs heavily in favor of the Court having jurisdiction over the Motion.

### 5.   Whether State Law or Bankruptcy Law Applies

This factor is relevant to post-confirmation jurisdiction because state law issues that have not yet been litigated, or have already been litigated in state court, are more appropriately matters for the state court, rather than the bankruptcy court.  Indeed, this Court noted in *Encompass* that, because the state court had already disposed of the issue in summary judgment, it was not a proper subject for post-confirmation bankruptcy jurisdiction.  *In re Encompass Servs.*, 337 B.R. at 876.

Here, although state law applies to the Contracts, no state court has presently pending before it—much less ruled on—the issue of whether the Contracts were terminated on or before August 25, 2006 and, even if the Contracts were terminated, whether the damages resulting therefrom constitute accounts receivable.  Moreover, this Court has already approved the Eagle Settlement and the Hallwood Settlement, and such approval was based upon Bankruptcy Rule 9019 and applicable bankruptcy case law governing settlement requests made under Rule 9019. Furthermore, this Court has held hearings on EDDO's disclosure statement and EDDO's Plan, both of which discuss and incorporate EDDO's contract claims against Hallwood.  Indeed, part of the source of funding to pay claims under the Plan is EDDO's suit against Hallwood and the resulting Hallwood Settlement.  All of these hearings concerned bankruptcy law, not state law. Given these circumstances, this Court is best situated to interpret the terms and conditions of the Plan, the Eagle Settlement, the Hallwood Settlement, the Prior Orders, and the Contracts.

Under the circumstances described above, this fifth factor strongly weighs in favor of this Court having jurisdiction.

### 6. Indices of Forum Shopping

This factor militates in favor of finding that this Court should retain jurisdiction over the Motion. In fact, allowing Eagle to litigate its purported claims against Hallwood—claims that it has released under the terms of the Eagle Settlement that this Court approved—would constitute a different, more egregious breed of forum shopping. Eagle would have the Oklahoma court interpret a settlement between EDDO and Eagle that was already extensively litigated before, and ruled on, by this Court. Allowing Eagle to assert a claim against Hallwood in Oklahoma, after sitting by silently while numerous hearings were conducted in this Court concerning EDDO's ownership and litigation of the same claim, would allow Eagle to sidestep the terms of the Eagle Settlement and this Court's Prior Orders. Thus, this last factor weighs in favor of the Court having jurisdiction.

In sum, five out of the six factors articulated in *In re Encompass Servs. Corp.* favor the Court having jurisdiction over this matter. Accordingly, the Court concludes that it has jurisdiction over the issues described in the Motion. The Court now addresses the various arguments on the merits made by Eagle.

### IV.  Whether EDDO's Motion Violates the Stay in Eagle's Chapter 11 Case

Eagle also complains that EDDO's Motion for Contempt violates the automatic stay in Eagle's Chapter 11 case because it is an attempt to obtain or exercise control over property of Eagle's estate under 11 U.S.C. § 362(a)(2), (3), and (6). Eagle argues that because neither the Eagle Settlement nor EDDO's Plan—nor this Court's order confirming it—purport to determine Eagle's rights with regards to the Contracts, Eagle should be able to pursue its contract

13

termination claims against Hallwood in its Chapter 11 case unmolested.  However, EDDO is not here asserting a claim against Eagle's estate; rather, EDDO is attempting to enforce its settlement with Hallwood and ensure that its Plan is implemented.  Indeed, this Court is not convinced that the remedy sought by EDDO constitutes a "claim" against Eagle's estate under the Bankruptcy Code.  The Bankruptcy Code defines a "claim" as a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment."  *See* 11 U.S.C. § 101(5).  Here, EDDO is not asserting a "right to payment" against Eagle's bankruptcy estate; rather, EDDO is attempting to enforce rights to property that this Court has already determined that it owns.  EDDO is not, therefore, attempting to do anything with regards to property in Eagle's estate.

Further, EDDO correctly points out that 11 U.S.C. § 959(a) allows "[t]rustees, receivers or managers of any property, including debtors in possession," (like Eagle) to be sued without court permission, "with respect to any of their acts or transactions in carrying on business connected with such property." 11 U.S.C. § 959(a).  Here, EDDO is seeking to prevent Eagle (in its present capacity as a debtor in possession in the Oklahoma bankruptcy) from prosecuting a claim that Eagle purported to release under the terms of their Settlement.  Additionally, a litany of Fifth Circuit cases support the notion that this Court has inherent power to enforce its own orders and to enforce settlements entered into by parties in this case (i.e. EDDO's case)—here, the Eagle Settlement, the Hallwood Settlement, and the Prior Orders. *See In re Omni Video, Inc.*, 60 F.3d 230, 232 (5th Cir. 1995); *Lockette v. Greyhound Lines, Inc.*, 817 F.2d 1182, 1195 (5th Cir. 1987); *Phillips v. Chevron U.S.A., Inc.*, 792 F.2d 526, 529-30 (5th Cir. 1986); *Cia Anon Venezolana De Navegacion v. Harris*, 374 F.2d 33, 36 (5th Cir. 1967).  Because this Court is not

14

being asked to deprive Eagle of its property, but rather to enforce its own orders and approved settlements, EDDO's Motion does not violate the stay in Eagle's bankruptcy case.

## V.   Eagle's Entitlement to an Adversary Proceeding

Eagle next asserts that this dispute should have been converted into a full adversary proceeding so as to afford Eagle due process. Indeed, in its Response, and at the hearing held on May 21, 2008, Eagle contended that the dispute before this Court can *only* be adjudicated through an adversary proceeding. Eagle's counsel argued that Eagle needed to have time to conduct discovery in order to establish that Hallwood terminated the Contracts prior to August 25, 2006, and that to hold an emergency hearing on the Motion would deny Eagle due process.

EDDO and Hallwood argued that an emergency did exist because the mere contention by Eagle that it has a claim against Hallwood for termination of the Contracts immediately puts the Hallwood Settlement in jeopardy. Moreover, both EDDO and Hallwood emphasize that Eagle cannot possibly have a good faith belief that it has a claim against Hallwood for termination of the Contracts prior to August 25, 2006.

Hallwood and EDDO's argument is grounded on three points. First, they emphasize that Eagle participated in EDDO's Chapter 11 case and knew about the disclosures that EDDO made regarding its claim against Hallwood for termination of the Contracts. Thus, Eagle knew that both EDDO and EDDO's creditors believed that any claim against Hallwood for termination of the Contracts belonged solely to EDDO; and Eagle therefore also knew, or should have known, that EDDO's creditors relied upon this information when voting on the Plan—a plan to which, EDDO and Hallwood note, Eagle could have objected but did not. Moreover, as part of the joint and mutual release that Eagle executed, Eagle agreed to waive any and all claims against EDDO, whether known *or unknown*. Indeed, the language expressly states that "[t]he releases . . .

15

include a release of any and all liens, claims, and encumbrances on the respective parties' properties or estates."[7]  Hence, even if Eagle subsequently discovered evidence leading it to believe that Hallwood terminated the Contracts prior to August 25, 2006, Eagle waived its right to pursue such a claim.  It could not pursue it because to do so would interfere with EDDO's prosecution of its claim for Hallwood's termination of the Contracts—a claim which EDDO had expressly preserved in its schedules, its disclosure statement, and its Plan; and a claim which creditors took into consideration when voting in favor of Plan confirmation.

EDDO and Hallwood also argue that Eagle could not possibly have a claim against Hallwood because there is no credible evidence that Hallwood terminated the Contracts prior to August 25, 2006 and because there is overwhelming evidence that the termination occurred after that date.  Because the assignment executed by EDDO and Eagle (the Assignment) clearly provides that the only rights under the Contracts retained by Eagle are accounts receivable extant as of August 25, 2006, there is no way, EDDO and Hallwood argue, that Eagle could be entitled to any money for a termination of the Contracts after August 25, 2006.  Such monies, even if they do constitute an account receivable, would represent a receivable created after August 25, 2006, which would therefore belong to EDDO pursuant to the Assignment; and Hallwood's failure to pay it would generate a claim for EDDO, not Eagle.

Finally, EDDO and Hallwood emphasize that even if Hallwood did terminate the Contracts prior to August 25, 2006, any monies owed by Hallwood for such termination would *not*, as a matter of law, constitute  an account receivable.  They contend that, because Eagle

---

[7] Eagle's very attempt to sue Hallwood under the same theory that EDDO has sued Hallwood represents an "encumbrance or claim" that Eagle is asserting on EDDO's property (i.e. EDDO's claim against Hallwood).

retained title under the Assignment only to certain accounts receivable, Eagle could not possibly now have a claim against Hallwood.

This Court finds merit in the argument that Eagle, by participating in EDDO's Chapter 11 case and plan confirmation process, has waived any right it might have to sue Hallwood for termination of the Contracts prior to August 25, 2006. However, even assuming that Eagle preserved its right to sue Hallwood, this Court afforded ample time for Eagle to conduct discovery and present its case opposing the Motion. Rather than hold an expedited hearing on May 21, 2008, the Court continued the hearing on the Motion and gave the parties almost four weeks to conduct discovery (during which Eagle took six depositions of Hallwood's officers and employees as well as obtained documents through production from Hallwood and EDDO) to ensure that due process was afforded to Eagle. *See In re Valente*, 360 F.3d 256, 265-66 (1st Cir. 2004) (determining that a bankruptcy court did not err by treating a matter as a contested matter, rather than initiating a full adversary proceeding, because "the standard of proof in these two types of proceedings are the same, the procedural rules are similar, and the proceedings provided [the litigants] with more than adequate notice and an opportunity to be heard"); *see also Saddle Creek Energy Dev. v. Eagle Domestic Drilling Operations*, No. H-07-MC-217, 2007 WL 1702398, at *1-2 (S.D. Tex. June 12, 2007) (noting this Court's decision in an earlier proceeding to treat a turnover motion, for the purposes of due process, as if it had been filed as an adversary proceeding). In an effort to balance the legitimate needs of EDDO—and of the claimants in EDDO's case whose claims will be paid from EDDO's receipt of the $2 million settlement from Hallwood—this Court decided not to dismiss the Motion and require EDDO to file an adversary proceeding.

17

In taking this approach, the Court balanced Eagle's due process rights with EDDO and Hallwood's legitimate concern that the integrity of EDDO's plan confirmation process would be severely undercut if EDDO were forced to spend six months or more prosecuting an adversary proceeding in this Court while Eagle continued to assert a claim against Hallwood in Oklahoma. Accordingly, on May 21, 2008, this Court gave the parties four weeks to conduct discovery, set a hearing on the merits for June 20, 2008, and limited the scope of this hearing by expressly stating that the hearing would focus solely on whether Hallwood terminated the Contracts prior to August 25, 2006, and if so, whether the monies owed due to the termination constitute an account receivable to which Eagle would be entitled.

The Court finds that the arguments of EDDO and Hallwood are persuasive. There is no question that EDDO firmly believed that, when it filed its bankruptcy petition, it had a claim against Hallwood for termination of the Contracts; otherwise, EDDO would not have scheduled the claim as it did. Moreover, there is no question that the creditors of EDDO, in reviewing the disclosure statement and in voting on the Plan, were led to believe—in good faith—that EDDO owned this claim and would prosecute and liquidate this claim pursuant to the Plan. And, finally, there is no doubt that Eagle participated in EDDO's case and is charged with knowing that: (1) both EDDO and its creditors believed that EDDO owned whatever claim existed as a result of Hallwood's termination of the Contracts; (2) EDDO would prosecute this claim after confirmation of the Plan and, as a result of such prosecution, liquidate the claim and use the proceeds to pay creditors; and (3) Any post-confirmation attempt by Eagle to sue Hallwood for termination of the Contracts—particularly when this attempt began after Hallwood settled with EDDO for $2 million—would disturb, if not completely disrupt, the Hallwood Settlement (i.e. significantly reduce the chances of Hallwood's paying the entire $2 million). Accordingly, this

18

Court concludes that, as a court of equity, its scheduling of the hearing on June 20, 2008 provided sufficient due process to Eagle.[8]

## VI.    Mootness

Eagle next asserts that EDDO's Motion is moot because its purported basis—fear that Hallwood would not make payments in the wake of Eagle's attempt to sue—has been obviated by Hallwood's payment of the first installment of $500,000.00 to EDDO on July 1, 2008.

### A. Whether Fear of Hallwood's Non-payment is the Sole Basis of EDDO's Claim.

The validity of Eagle's mootness argument depends on whether the primary basis of the Motion is fear that Hallwood will not honor the Hallwood Settlement.  If this fear is not the primary basis of EDDO's motion, Eagle's argument suffers because Hallwood's $500,000.00 payment to EDDO is insufficient to assuage all of EDDO's concerns underlying the Contempt Motion.

EDDO's concern that Hallwood will not make payments pursuant to the Hallwood Settlement is certainly one basis for the Contempt Motion.  EDDO, in justifying its contention that Eagle is interfering with EDDO's effectuation of the Plan, expressly stated that Eagle is jeopardizing the Hallwood Settlement.

However, other claims within the Contempt Motion reveal alternative bases for EDDO's concern.  One basis is EDDO's hope to effectuate the Plan without interference, as evidenced by EDDO's argument that Eagle is interfering with EDDO's effectuation of the Plan.  Another basis is EDDO's desire to validate its ownership of the claim against Hallwood, as evidenced by

---

[8] As already noted, Eagle conducted six depositions of Hallwood officers and employees in preparation for the June 20 hearing.  Eagle also obtained extensive documents from both Hallwood and EDDO.  Thus, due process was provided to Eagle.

EDDO's position that Eagle, by seeking leave to sue Hallwood, is asserting a claim that is in fact owned by EDDO.

**B. Whether Payment of the First Installment is Sufficient to Render EDDO's Motion Moot.**

Even if fear that Hallwood will not make payments is indeed the primary basis of the Motion, Eagle must still establish that Hallwood's $500,000.00 payment to EDDO is sufficient to render EDDO's Contempt Motion moot.

Mootness exists when the issues presented in a suit are no longer live or the parties lack a legally cognizable interest in the outcome. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Mootness, such that no legally cognizable interest exists, requires (1) no reasonable expectation that the alleged violation will recur; and (2) complete and irrevocable eradication of the alleged violation by interim relief. *Id.* The burden of proving these two elements is heavy. *Id.* (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953)). For the reasons set forth below, neither element is met in the dispute at bar.

**1. No reasonable expectation that the alleged violation will recur**

The first element is not met because Hallwood's $500,000.00 payment is only the first of multiple installments. As such, it is not unreasonable for EDDO to expect that the alleged violation (failure to comply with the Hallwood Settlement) might occur—especially given Hallwood's threats to renege on its settlement obligations if forced to litigate the claim with Eagle. The case of *County of Los Angeles v. Davis* is instructive. 440 U.S. 625 (1979). In *Davis*, the County of Los Angeles succeeded in appealing, on mootness grounds, a district court's finding that a minority job applicant's claim that a civil service examination violated 42 U.S.C. § 1981. The appellate court found no reasonable expectation of recurrence because (1)

the County had not used an unvalidated exam for three years; (2) such exams were only used in unique circumstances that no longer existed; and (3) measures had already been taken both to increase minority representation and to institute an efficient and nonrandom screening mechanism. *Davis*, 440 U.S. at 632.

Here, however, EDDO's receipt of the $500,000.00 payment only partially fulfills Hallwood's cash obligations (which total $2,000,000.00) under the Hallwood Settlement and constitutes no guarantee that EDDO will receive the remaining $1.5 million. Thus, there is a reasonable expectation that the alleged violation will occur. Further, whereas three years had passed since the County had used an unvalidated exam in *Davis*, here Hallwood has upcoming payments to make in the near future—i.e. on September 30, 2008.

### 2. Complete and irrevocable eradication by interim relief

Similarly, the second element of mootness is not satisfied because Hallwood's $500,000.00 payment cannot be "complete and irrevocable eradication of the alleged violation."

Paragraph 2 of the Hallwood Settlement requires Hallwood to pay to EDDO $2,000,000.00 in cash and $2,750,000.00 in equity of Hallwood or the successor entity. Such payment of cash and equity is not due until either Hallwood's attainment of major financing or June 30, 2008 (whichever is later).

Paragraph 3 requires that, if Hallwood has not completed major financing but has received bridge financing (totaling at least $20 million) before June 30, 2008, Hallwood must deliver to EDDO a $500,000.00 cash payment that (1) extends the June 30, 2008 deadline in Paragraph 2 to September 30, 2008; and (2) will be credited to the $2,000,000.00 cash obligation described in Paragraph 2 (only if both the cash and equity obligations described in Paragraph 2 are fulfilled by the new September 30, 2008 deadline).

21

Given these terms, EDDO's receipt of $500,000.00 from Hallwood on July 1, 2008 indicates that Hallwood has not received major financing. Therefore, Hallwood's remaining obligations are governed by Paragraph 3. As such, Hallwood's remaining obligations to EDDO amount either to $4.75 or $4.25 million in the aggregate (cash and equity).[9] Therefore, by definition, the $500,000.00 payment by Hallwood is merely a partial, and therefore *incomplete*, resolution of EDDO's rights under the Hallwood Settlement. Such an incomplete resolution cannot be an "eradication of the alleged violation" as required by the second element of mootness.

Moreover, this payment does not per se constitute an "irrevocable eradication of the alleged violation," given the possibility that a favorable outcome for Eagle (i.e. if Eagle is allowed to proceed in its contract termination lawsuit against Hallwood) might prompt Hallwood to seek future restitution from EDDO for the $500,000.00 already paid.

For all of these reasons, the Motion is not moot.

### VII.    Ripeness

Eagle next asserts that EDDO's Contempt Motion is not ripe for adjudication because the Oklahoma bankruptcy court has not yet ruled on Eagle's Motion for Leave to prosecute the claim against Hallwood for termination of the Contracts. The basis of Eagle's position is that EDDO's Motion opposes an amended complaint from Eagle that has not yet been litigated and is contingent upon the Oklahoma court's granting of Eagle's Motion for Leave, which has not yet occurred. Despite these arguments, this Court finds that the Motion is ripe because of the great

---

[9] If Hallwood meets the September 30, 2008 deadline for making its payment, its remaining obligations total $4.25 million. Otherwise, its remaining obligations will total $4.75 million.

injury to which EDDO would be subjected if all the time and expenses incurred in achieving the Plan's confirmation were to be rendered useless.

For ripeness to exist, a plaintiff must show that immediate injury will be sustained and that such injury would be redressed by the relief requested. *In re Contractor Tech., Ltd.*, No. 05-37623, 2007 WL 2819773, at *2 (Bankr. S.D. Tex. Sept. 21, 2007) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)).

EDDO seeks a declaratory judgment that Eagle holds no claim against Hallwood for termination of the Contracts and that Eagle is in contempt of this Court's Prior Orders.[10] Declaratory judgments are ripe (i.e. there is an "actual controversy") only if designed to redress immediate harm, rather than harm contingent on future events. *Id.* at *3. The *ex ante* nature of a declaratory judgment's determination of rights, however, creates tension with traditional notions of ripeness. *Id.* (quoting *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000)). The ripeness of declaratory judgment requests is determined on a case-by-case basis. *Id.* (citing *Certain Underwriters at Lloyd's, London v. A&D Interests, Inc.*, 197 F. Supp. 2d 741, 749 (S.D. Tex. 2002)).

The assertions in EDDO's Motion reflect that EDDO is concerned with the following injuries: successful effectuation of the Plan, its ownership of the claims resolved in the Hallwood Settlement, and its receipt of future installments pursuant to the Hallwood Settlement.

Eagle argues that because Eagle has not litigated its putative amended complaint against Hallwood, the potential injury to EDDO from losing ownership of, and receipt of future installments under, the Hallwood Settlement is contingent on future events. These injuries are contingent, in sequence, on the Oklahoma bankruptcy court's approval of Eagle's Motion for

---

[10]   This discussion proceeds under the assumption that EDDO's motion is a declaratory action.

Leave, Eagle's proceeding to litigate its amended complaint against Hallwood, and Eagle's success in litigating the case.

EDDO responds compellingly that the potential undermining of the Plan is not a contingent injury, but an immediate injury sufficient to establish ripeness because of the substantial time and expenses EDDO has already incurred in obtaining confirmation of the Plan. If Eagle were allowed to proceed with litigation against Hallwood, EDDO would *immediately* lose all time and monies invested in litigation of the contract termination claim against Hallwood. Further, EDDO would *immediately* lose the finality and predictability of its successful litigation against Hallwood.

Given the above circumstances and the fact that this Court has the discretion to analyze the ripeness of declaratory judgments on a case-by-case basis, this Court finds that EDDO's Contempt Motion against Eagle is ripe for adjudication.

## VIII.   *Res Judicata*

### A. *Shoaf* applies.

This Court believes that the principle of *res judicata*, as articulated in *Republic Supply Co. v. Joseph Shoaf*, 815 F.2d 1046 (5th Cir. 1987), undermines Eagle's attempt to litigate the claim against Hallwood in Oklahoma. *Shoaf* stands for the proposition that a claimant is precluded from bringing a collateral attack on an issue already litigated in, and decided by a confirmation order of, the bankruptcy court. *See Shoaf*, 815 F.2d at 1050-54. In *Shoaf*, a debtor successfully appealed a decision by the district court that did not give the bankruptcy court's confirmation order res judicata effect. *Id.* at 1054. The Fifth Circuit held that the bankruptcy court's confirmation of a plan that released the debtor's guarantor from liability precluded a creditor from trying to relitigate the issue of the guarantor's liability in a collateral action brought

24

in the district court. *Id.* at 1050-54. The Fifth Circuit determined that because the issue of the guarantor's liability was raised at an initial disclosure statement hearing in the bankruptcy court (even though the issue was not raised at the confirmation hearing), the issue had been sufficiently litigated so as to be precluded. EDDO's overarching argument under *Shoaf* is that Eagle should be barred from litigating the claim against Hallwood in Oklahoma because the claim was already the subject of this Court's Prior Orders. EDDO further argues that to allow Eagle to assert ownership of and litigate the claim against Hallwood would contravene the Plan's terms.

A bankruptcy court's confirmation order is entitled to the effect of *res judicata*. *Id.* at 1051 (citing *Southmark v. Charles House Corp.*, 742 F.2d 862, 869 (5th Cir. 1984)). For the Prior Orders to have *res judicata* effect with respect to the claim against Hallwood for termination of the Contracts, the following elements must be satisfied: (1) the parties must be identical in both suits, (2) this Court must have had competent jurisdiction to render the Prior Orders, (3) the Prior Orders must have been a final judgment on the merits, and (4) the same cause of action must be involved in the Oklahoma bankruptcy court. *Id.* Here, the Court concludes that all these elements are satisfied so as to preclude Eagle from litigating the claim against Hallwood in the Oklahoma bankruptcy court.

**1. Identity of the Parties**

This element is satisfied where the parties in both suits are "parties in interest," that is, "persons whose interests are properly placed before the court by someone with standing to represent them." *Id.* (quoting *Southmark*, 742 F.2d at 869). The *Shoaf* court held this element satisfied where "both parties participated in the proceedings . . . and became parties even if never formally named as such." *Id.* Such is the case here. Eagle actively participated in EDDO's Chapter 11 case and plan confirmation process and has sat by while the claim against Hallwood

25

was litigated and then implemented into the Plan. Eagle had ample opportunity to object to EDDO's ownership of the claim and to object to the claim's inclusion in the Plan. Therefore, Eagle had standing and the opportunity to represent its interests, which "were properly placed before the court." *Id.* That Eagle chose not to intervene or object does not change the fact that it had knowledge of, and an interest in, the matter. Therefore, the first element for application of *res judicata* is satisfied.

### 2. Prior Judgment by a Court of Competent Jurisdiction

It is undisputed that this Court has jurisdiction to issue a confirmation order containing provisions for the distribution of the Hallwood Settlement. Eagle does not argue that EDDO did not properly assert ownership to the Hallwood Settlement—nor could it now, given that Eagle failed to raise an objection concerning EDDO's Claim against Hallwood at any hearing leading up to the confirmation order. Further, the *Shoaf* court made clear that, by entering judgment (here, a confirmation order), a bankruptcy court "tacitly, if not expressly, determines its jurisdiction over the parties and the subject matter." *Id.* at 1052. Because Eagle has not challenged this Court's jurisdiction to issue the Prior Orders, those orders were therefore rendered by a court of competent jurisdiction for the purposes of *res judicata*. *Id.* at 1053.

### 3. Final Judgment on the Merits

Eagle does not argue that this Court's Order confirming EDDO's Plan is not a final judgment on the merits. "[A] final judgment for the purposes of *res judicata* must finally dispose of some matter which under the substantive law to be applied and the procedural law of the forum can be, and has been, finally disposed of." *Southmark*, 742 F.2d at 870 n.10. The Fifth Circuit explained in *Shoaf* that a bankruptcy court's confirmation of a plan that provides for resolution of a matter, even though the matter is not actually litigated, is an order that is final and

appealable. *Shoaf*, 815 F.2d at 1053. Thus, this Court's Confirmation Order of February 26, 2008, which Eagle did not appeal, is now a final judgment on the merits for the purposes of *res judicata*.

### 4. The Same Cause of Action

The Fifth Circuit applies a "transactional test" to determine whether parties are asserting the same cause of action for *res judicata* purposes. *See id.* at 1053-54. The dispositive question is whether Eagle's cause of action against Hallwood "arose out of the same transaction that was the subject of [this] [B]ankruptcy [C]ourt's order." *Id.* at 1054. There is no doubt that EDDO's claim against Hallwood and the claim Eagle now seeks to assert against Hallwood in its Oklahoma bankruptcy proceeding are one and the same. Both claims concern Hallwood's termination of the Contracts, and the amount owed as a result of such termination. In fact, the only difference between Eagle's theory of recovery and EDDO's is the name of the claimant. Because this Court has already decided, without objection from Eagle, that EDDO owns the claim against Hallwood under the Contracts, the matter has already been litigated. Eagle's argument that the claim against Hallwood for contract termination should be considered an "account receivable" is a semantic distinction, which is unrelated to whether the underlying matter involves the same cause of action for *res judicata* purposes. Because Eagle's claim in the Oklahoma bankruptcy court is premised on Hallwood's liability for terminating the Contracts, a matter which has already been litigated in this Court, Eagle's claim is barred by *res judiciata*.

### B. *Orix* does not apply.

Eagle asserts that the *res judicata* issue in this case is more akin to that in *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891 (5th Cir. 2000). *Orix* stands for the proposition that a party's complaint that a *contingent* claim is barred by *res judicata* may not be ripe for

adjudication. *Id.* at 898. The creditor in Orix sued for a declaratory judgment that a draft motion containing objections to the creditor's proof of claim was barred by *res judicata*. *Id.* at 893. The Fifth Circuit held that because there was no actual controversy—as there was no indication that the debtors would actually file the draft motion—the creditor's declaratory judgment action was not ripe. *Id.* at 896-98. The Fifth Circuit pointed out that a declaration that the draft motion was barred by *res judicata* would preclude not only the filing of the draft motion, but also a broad class of potential future claims, none of which might ever be filed. *Id.* at 896. The court also took care to note that threats of litigation—if specific and concrete—are not necessarily foreclosed from serving as the basis for a declaratory judgment, even if such threats are contingent on future events. *Id.* (citing *Nucor Corp. v. Aceros y Maquilas de Occidente*, 28 F.3d 572, 578 (7th Cir. 1994); *Tex. v. W. Publ'g Co.*, 882 F.2d 171, 176 (5th Cir. 1989)). However, the court did not find the possibility that the draft motion would be filed "sufficiently immediate and real so as to constitute a justiciable controversy." *Id.* at 896-97 (quoting *Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986)). This finding was based on evidence that the draft motion would only be filed (thereby constituting a real threat of future litigation) if certain documents, both necessary for the draft motion and unlikely to be found, could be utilized. *Id.* at 897.

The facts in *Orix* are distinguishable from the facts in this case for two reasons. First, the relief requested in EDDO's Motion would not bar a broad class of future claims that may never be litigated. Rather, the Motion is narrowly framed to bar *only* Eagle's contract termination claim against Hallwood. Second, unlike the draft motion in *Orix*, which would not likely be filed, here, the only thing standing between Eagle and its filing of the amended complaint is the Oklahoma bankruptcy court's approval of Eagle's Motion for Leave. Given the lenient standards

28

for granting leave to file motions and amendments, the Oklahoma court's granting of Eagle's Motion for Leave is "sufficiently likely."[11]  *Id.* at 897 (citing *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993)).  Therefore, a declaratory judgment identifying the precluded claims in Eagle's amended complaint is warranted in this case.

Given the above observations, this Court finds that Eagle is barred by *res judicata* from litigating its putative contract termination claim against Hallwood.  Despite its active participation in EDDO's bankruptcy case, Eagle never objected to EDDO's Plan nor appealed the Plan's confirmation order.  As such, under *Shoaf*, Eagle should be barred from retroactively usurping EDDO's Claim.  Further, any argument presented by Eagle, under *Orix*, that attacks the ripeness of EDDO's Motion to Compel fails because EDDO seeks to bar only one claim that will almost certainly be litigated on the merits if Eagle's Motion for Leave is granted.

### IX.     Did the Contracts terminate before August 25, 2006?

Assuming that the claim for termination of the Contracts can be classified as an account receivable, Eagle retains ownership of the claim against Hallwood (already litigated to settlement by EDDO) only if the Contracts terminated before August 25, 2006.  However, the circumstances preceding and following August 25, 2006 indicate that the Contracts did not terminate before August 25, 2006.

### A. Specific Factual Background

---

[11] Rule 15(a)(1) allows a party to amend its pleading once as a matter of course before being served with a responsive pleading, or within 20 days after serving the pleading if a responsive pleading is not allowed and the action is not yet on the trial calendar. Fed. R. Civ. P. 15(a)(1). Further, Rule 15(a)(2) requires courts to "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Eagle may retain the benefits of this liberal standard even after having missed a deadline in a scheduling order. *See Hawthorne Land Co. v. Occidental Chem. Corp.*, 431 F.3d 221, 227 (5th Cir. 2005) (citing *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003)). Rule 15(a)'s liberal standard also applies if the movant can show "good cause" for modifying the scheduling order. *Id.* For example, courts are charged with considering (1) explanation for the failure to move timely for leave to amend, (2) the importance of the amendment, (3) potential prejudice in allowing the amendment, and (4) the availability of a continuance to cure such prejudice. *Id.* Based on these standards, this Court finds the possibility that Eagle's Motion for Leave will be granted is a contingency that is sufficiently likely to occur.

### 1. Events leading up to the dispute[12]

On August 13, 2006, the mast on Rig 12, one of the rigs under the Contracts, collapsed. On August 14, 2006, Hallwood requested from Eagle a copy of certain inspection reports and indicated to Eagle that it would shut down drilling operations temporarily.  In response, Eagle communicated that the Contracts did not obligate Eagle to permit or provide for inspections, and that a delay would cause Hallwood to be charged the stand-by rate under the Contracts. Hallwood responded in turn by indicating (1) its concern for the safety of both Rig 11 and Rig 12; (2) its understanding that payment of the stand-by rate under the Contracts was unnecessary until repair work on Rig 12 was completed; and (3) its willingness to pay the day rate while awaiting Rig 11's inspection.

### 2. Hallwood begins to indicate its concerns

On August 17, 2006, Hallwood communicated to Eagle its agreement to pay the day rate until Rig 11's inspection was completed, but also indicated the need to discuss its future obligations to pay the day rate if that inspection was not completed quickly.  On August 21, Hallwood's counsel informed Eagle that Hallwood believed that it should not be responsible for continued payment of the day rate.

### 3. The Assignment and Notices of Assignment

On August 25, 2006, Eagle and EDDO executed the Assignment.  Under the Assignment, Eagle assigned and conveyed "all of its right title and interest to (a) the Contracts as of [August 25, 2006] in accordance with Section 27.27 of each Contract and (b) the Other Assets."  The only exclusions to the Assignment were (1) the accounts receivable as of and through the date of the

---

[12] The facts contained herein were taken from testimony adduced, and exhibits submitted by the parties, at the June 20, 2008 hearing.

Assignment's execution, and (2) all amounts received by Eagle from the Contracts prior to the Assignment's execution.  On this same date, Notices of Assignment were prepared by Eagle, which stated that EDDO "shall immediately take full duties and responsibilities of [Eagle] as defined therein and all monies and other obligation[s] owing to [Eagle] thereunder should be, from the date hereof forward, remitted to [EDDO]."  Neither Notice of Assignment stated that Eagle retained any rights under the Contracts with Hallwood.

### 4. Termination of the Contracts

On August 30, 2006, counsel for EDDO informed Hallwood that, in light of Hallwood's failure to make payments under the Contracts, EDDO could stop drilling and invoke the liquidated damages provision under the Contracts.  On September 6, 2006, Hallwood's counsel informed counsel for EDDO that the Contracts were being terminated.  On September 21, 2006, counsel for EDDO communicated to Hallwood's counsel disagreement with Hallwood's counsel's statement on September 6, 2006, and gave written notice that the Contracts were terminated.

## B. Analysis

The Contracts did not terminate before August 25, 2006.  First, an intuitive consideration of the presumptions underlying correspondence between Hallwood and Eagle from August 14, 2006 to August 21, 2006 supports this finding.  Second, this finding is also supported by Oklahoma's standard for contract termination and the Contracts' termination clause.[13]

## 1. Correspondence from August 14 to August 21, 2006

All actions and representations by Eagle and Hallwood on, and prior to, August 25, 2006 operate under the presumption that the Contracts were still intact.  First, on August 14, 2006,

---

[13] As discussed in this opinion, Oklahoma law applies with regard to the Contracts.

Hallwood and Eagle's communications suggest that both parties believed that the Contracts were in effect. On that day Eagle (1) referenced the Contracts when it conveyed to Hallwood its purported obligations (i.e. whether it needed to permit and provide for inspections) *under the Contracts*, and (2) invoked the possibility of charging Hallwood the stand-by rate *as governed by the Contracts*. On the same day, Hallwood questioned whether its payment of the stand-by rate to Eagle was necessary *under the Contracts*. Next, while the actions of Hallwood's counsel on August 17 and August 21 indeed indicated escalation of the budding dispute between Eagle and Hallwood, they did not negate outright the Contracts' validity. Finally, the Assignment and the Notices of Assignment suggest that the Contracts had not been terminated prior to August 25, 2006 (their date of execution), as both documents contain numerous references to the Contracts and reflect a conveyance from Eagle to EDDO of rights under the Contracts. Thus, communications between Eagle and Hallwood on all four relevant dates (August 14, 17, 21, 25) on or before August 25, 2006 indicate that the Contracts had not been terminated before that date.

The first evidence of termination of the Contracts is on September 6, 2006. EDDO's representations, via counsel, on August 30, 2006 do not indicate termination of the Contracts because they refer to the potential invocation of the Contracts' liquidated damages clause against Hallwood. September 6, 2006, is the first time the word "termination" is used by either party. However, this unilateral declaration of contract termination by Hallwood may not have effected an actual termination because Hallwood and EDDO do not agree that the Contracts were terminated until September 21, 2006.

## 2. Applying Oklahoma law in conjunction with the Contracts and the Exhibits

Further, analysis of Eagle's and EDDO's exhibits in conjunction with the Contracts and Oklahoma case law—applicable because the Contracts were governed by Oklahoma law—indicates that the Contracts did not terminate before August 25, 2006. Eagle argues that Hallwood opted to terminate the Contracts before August 25, 2006 under the Contracts' early termination clause, which triggered the Contracts' liquidated damages provision resulting in an account receivable owed to Eagle and excepted from the Assignment. Under Oklahoma law, repudiation (or in this case invocation of a contract's unilateral early termination clause) must be clear and unequivocal such that a mere expression of intent not to perform is insufficient to terminate a contract.[14] *Okla. Tax Comm'n v. Fortinberry*, 207 P.2d 301, 307 (Okla. 1949). Further, repudiation is valid only if the contract is "treated and acted upon as such by the party to whom the promise was made." *Id.* (quoting *In re Smoot*, 82 U.S. 36, 48 (1872)). Under *Fortinberry*, the Contracts did not terminate on or before August 25, 2006. Before that date, Hallwood only expressed its intent not to perform if certain contingencies did not occur. Further, Eagle's actions on and prior to August 25, 2006 do not treat the Contracts as if they were terminated.

Under each Contract, early termination can occur under section 6.3(a), 6.3(b), or 6.3(c). However 6.3(a) (termination "by either party") and 6.3(c) (termination "by contractor") require *written* notice of early termination, which occurs, at the earliest, on September 6, 2006, the date on which the word "termination" was used for the first time in any communication between EDDO and Hallwood. Therefore, Eagle can only be successful in proving that the Contracts

---

[14] Because Eagle takes the position that the Contracts terminated because of various musings in the brains of Hallwood employees prior to August 25, 2006, this Court looks to the law of repudiation to determine whether the parties expressed a clear intent to invoke the Contracts' early termination clause under Oklahoma law.

terminated before August 25, 2006 if it can show that early termination occurred under 6.3(b) (termination "by operator").  6.3(b) gives the Operator—Hallwood—the "right to direct stoppage of the work performed by Contractor [Eagle]."

The following discussion will analyze all relevant communication between Eagle and Hallwood in search of evidence indicating that the Contracts terminated prior to August 25, 2006 in light of both section 6.3(b) of each Contract[15] and Oklahoma law's standard for contract termination.

### a. Email Correspondence on August 14, 2006

On August 14, 2006, Hallwood's counsel indicated to Eagle (in the "First Email") that Hallwood would shut down both drilling operations and that both rigs would be on downtime until Hallwood's counsel's receipt of certain reports from Eagle and until Hallwood could perform its own inspections.[16]  This email cannot constitute a clear and unequivocal repudiation under *Fortinberry* because Hallwood's counsel made it clear that the rig would be down and that drilling operations would cease only temporarily.  For the same reason, this email does not constitute early termination under 6.3(b), which does not cover contingent or temporary stoppages.

In response to the First Email, Eagle communicated to Hallwood's counsel (in the "Second Email") its understanding that Hallwood would be charged the stand-by rate and

---

[15] This Court reviews emails from both EDDO and Hallwood for evidence of Contract termination.  In addition, because 6.3(b) termination is dependent on action by the Operator (i.e. Hallwood), Hallwood's emails are subjected to further analysis by this Court for evidence of attempts to "direct stoppage of the work performed by Contractor."

[16] This email, sent at 8:11 AM, is Eagle's Exhibit 3 and EDDO's Exhibit 2.

requested Hallwood's counsel to "clarify [his] intentions."[17]   A request merely for clarification of intentions falls far short of a clear and unequivocal repudiation of the Contracts.

In response to the Second Email, Hallwood's counsel clarified its position to Eagle (in the "Third Email").[18]   First, Hallwood's counsel reiterated Hallwood's understanding of the daywork contract and requested that Eagle inform Hallwood of its view of the agreement. Second, Hallwood's counsel noted that Hallwood would "consider [its] alternatives" once the requested inspection was completed and once it received a certain report.   That Hallwood's counsel (1) was receptive to Eagle's "view of the agreement"; and (2) indicated that Hallwood would "consider [its] alternatives" underscores that Hallwood believed that the disagreements could be worked out and that, therefore, contract termination had not yet become necessary. Thus, the Third Email includes no clear and unequivocal repudiation of the Contracts.   Further, since the Third Email does not direct the stoppage of Eagle's work, it cannot have triggered 6.3(b) termination.

**b.  Email Correspondence on August 15, 2006**

On August 15, 2006, in response to the Third Email, Eagle reiterated to Hallwood its understanding of the parties' respective obligations under the Contracts (in the "Fourth Email").[19]   Eagle asserted that the Contracts did not require the inspection requested by Hallwood.   Regarding who should pay for the inspection, Eagle wrote "[o]ur contract in 14.1 clearly states contractor is responsible for damage to surface equipment.   The only exception is in section 10."  Such references to the Contracts presume that Eagle believed the Contracts were still in existence at the time of this email, such that the Fourth Email cannot satisfy *Fortinberry*'s

---

[17] This email, sent at 9:37 AM, is Eagle's Exhibit 3.

[18] This email, sent at 9:14 PM, is EDDO's Exhibit 4.

[19] This email, sent at 7:09 PM, is EDDO's Exhibit 4.

requirement of "clear and unequivocal repudiation."  In addition, the Fourth Email concludes with the following language:

> I want our companies to work together to do what is right and fair.  Neither one of our companies is making money right now.  Please tell what you believe is fair and hopefully we will agree.  Thanks for your help in resolving this dispute.

This language indicates that Eagle, at the time of the Fourth Email, intended to collaborate with Hallwood to achieve a fair resolution of the instant dispute.  This attitude does not reflect a "clear and unequivocal repudiation," as is necessary to terminate a contract under Oklahoma law.

### c.  Email Correspondence on August 17, 2006

On August 17, 2006, Hallwood's counsel sympathized with Eagle's objection to the necessity of a Category IV inspection and expressed Hallwood's willingness to settle for a Category III inspection (in "the Fifth Email").[20]  Hallwood also agreed to pay the engineer's fees associated with such an inspection.  Given Hallwood's overall position that some measure of inspection was absolutely necessary, Hallwood's willingness both to alter the category of inspection and pay the associated engineer's fees was a concession.  Such a concession indicates Hallwood's intent to collaborate with Eagle to consummate the Contracts' terms, rather than an intent to terminate the Contracts, and does not constitute a "clear and unequivocal repudiation" under *Fortinberry*.  Further, Hallwood's counsel agreed in the Fifth Email to pay the day rate during the inspection, but expressed the "need to discuss how [payment of the day rate] affects [Hallwood's] obligation . . . going forward."  While this language may be designed to preserve Hallwood's rights,[21] it does not constitute a "clear and unequivocal repudiation" of the Contracts.

---

[20] This email, sent at 11:08 AM, is EDDO's Exhibit 5.

[21] Hallwood may have been concerned that paying the day rate would allow Eagle to assert a waiver argument in the future.

Finally, since the Fifth Email does not direct the stoppage of Eagle's work, it cannot have triggered 6.3(b) termination.

Eagle responded to the Fifth Email (with the "Sixth Email").[22]  Eagle's manager claimed to have received "conflicting information" about Hallwood's desires for inspection and even said "I am confused."  These comments suggest uncertainty about Eagle's desires rather than an outright rejection of Hallwood's performance sufficient to indicate a "clear and unequivocal repudiation" of the Contracts.  Further, Eagle makes representations in the Sixth Email indicating its intention to collaborate with Hallwood to achieve a resolution.  For example, the Sixth Email states that "Eagle wants to begin repairs as soon as possible," which "will limit down time and expense to both our companies."  Further, Eagle referenced Section 10[23] of the Contract as if the Contract were still intact when it wrote "[t]his will determine if Section 10 of our contract is triggered or not."  Therefore, under the *Fortinberry* standard, the Sixth Email does not indicate that the Contracts terminated before August 25, 2006.

### d.  Email Correspondence on August 21, 2006

On August 21, 2006, Hallwood's counsel reiterated its concerns to Eagle about the rigs' compliance with contract specifications (in the "Seventh Email").[24]  Though Hallwood indicated its belief that it should not be responsible for continued payment of the day rate, it also made suggestions for resolving "the relationship between Hallwood and Eagle."  Further, Hallwood indicated its "hope that these matters can be amicably resolved."  Though the Seventh Email does escalate tensions, being the first indication of Hallwood's refusal to pay the day rate, its

---

[22] This email, sent at 9:46 PM, is EDDO's Exhibit 6 and Eagle's Exhibit 14.

[23] According to Section 10, entitled "Sound Location," the Operator must reimburse Contractor for all losses from subsurface conditions causing cratering or shifting of the location surface, or from sealed conditions proving unsatisfactory to support the rig during marine operations.

[24] This email, sent at 4:38 PM, is EDDO's Exhibit 7.

spirit of resolution forecloses the possibility of "clear and unequivocal repudiation" under *Fortinberry*.  Further, Hallwood's refusal to pay the day rate does not trigger 6.3(b) of the Contracts because this refusal does not constitute Hallwood's "direct stoppage of the work performed by [Eagle]."

### e. Hallwood's Morning Report

Hallwood's Morning Report (the Morning Report) also indicates that the Contracts were not terminated prior to August 25, 2006.  The relevant dates of the Morning Report[25] are those between August 14, 2006 (the day after Rig 12's collapse) and August 25, 2006 (the effective date of the Assignment's execution[26]).  None of the headings for these dates indicates Hallwood's invocation of its "right to direct stoppage of the work performed by [Eagle]" under 6.3(b) of the Contracts.  First, the headings for August 14 and August 15 indicate that substantial work was performed on those days.[27]  Second, the headings for August 16, 17, 18, and 19 read as follows: "Stand by.  Waiting on Derrick Inspectors."  Standing by and waiting on inspectors is insufficient to trigger early termination under 6.3(b) of the Contracts, which requires the finality of "stoppage."  Third, the heading for August 20 indicates that substantial work was performed

---

[25] This report is Eagle's Exhibit 5.

[26] The Attorneys for both parties actually signed the Assignment on August 24, 2008, but the effective date is August 25, 2006.

[27] The work summary for August 14, 2006 in the morning report indicates that the following work was done on that day: "Rig up, raise Derrick. Rigged up floor. Laid Derrick back down. Rig maintenance while waiting on orders." [Eagle's Exhibit 5.] The work summary for August 15, 2006 in the morning report indicates that the following work was done on that day: "Rig maintenance while waiting on orders. Release and load out pason, jim wind phones and HB trailers. Rig down Hallwood's shaker and mud cross. Store on location. Rig down and release hydrill and DSA. Rig down Hallwood's transfer pumps and hoses. Store in Hallwood's small trailer. Moved trailer to Searcy Office parking lot." [Eagle's Exhibit 5.]

on that day.[28]  Finally, the headings for August 21, 22, 23, 24, and 25 read, "Wait on orders." Again, waiting for orders falls far short of the finality required for 6.3(b) termination.

### f. Deposition of Richard A. Taylor

Though Eagle seeks to find support in Richard A. Taylor's deposition on December 13, 2007 (the Deposition) for its position that the Contracts terminated before August 25, 2006, the Deposition[29] actually supports Hallwood.  The Deposition is relevant because Richard A. Taylor (Taylor) was the "operation superintendent" of Hallwood who was in charge of most operations "from the field standpoint."  (see pages 10-12 of deposition transcript).

Eagle points to Taylor's affirmative response when asked if a certain rig was "terminated before it started," as evidence that a stoppage occurred.  However this argument is unpersuasive. Taylor's previous statement, "we never rigged it up," suggests that Hallwood's actions on that rig could not constitute an affirmative "stoppage of the work performed by [Eagle]."  Hallwood could not very well have stopped Eagle's work on a well that never began operating.

Other portions of the Deposition also indicate that the Contracts did not terminate.  On two occasions, Taylor states that he never made recommendations to terminate the rig.  First, in response to Mr. Maloney's question, "[o]ther than that,[30] you didn't make any recommendation to terminate the rig, did you," Taylor replied "No" (page 93 of deposition transcript, lines 11-13). Second, in response to Mr. Maloney's question "[b]ut you didn't recommend that they terminate

---

[28] The work summary for August 20, 2006 in the morning report indicates that the following work was done on that day: "RU crane. Unstring blocks. Remove Derrick from Sub Structure and set on pipe racks. Perform Derrick Survey/Inspection with DSL."  [Eagle's Exhibit 5.]

[29] The Deposition is in Eagle's Exhibit 8.  Though the Deposition took place on December 13, 2007, the portions considered in this discussion refer to events occurring prior to August 25, 2006.

[30] Considering this specific exchange in the Deposition, Mr. Maloney's prefacing this question with "other than that" does not indicate Mr. Taylor's previous concession that he made recommendations to terminate the rig. This question from Mr. Maloney immediately follows an exchange in which Mr. Taylor expresses that he "made recommendations based on the need for a Category IV inspection on Eagle Rig 11 . . . before [Rig 11] drilled any further" (page 93, lines 4-7).

based upon what you knew, did you?" Taylor again replied "No" (page 93 of deposition transcript, lines 18-20).

Additional deposition testimony underscores Taylor's belief that Hallwood never intended to terminate the Contracts before August 25, 2006. First, in response to Mr. Maloney's question "Did Hallwood want to in – ensure itself that the 11 and 12 were adequate to do the work" Taylor replied "Yes" (page 157 of deposition transcript, lines 8-10). Second, in response to the question "If the 11 and the 12, or the new derrick for the 12 and 11, had passed a 4G inspection, in your view, would they have been adequate to come back to work for Hallwood?" Taylor said "Yes, they would have been" (page 157 of deposition transcript, lines 19-23). Both of these exchanges suggest that Hallwood's intent when demanding inspections was to obtain assurance that the rigs were ready for work and to temporarily cease drilling operations on that basis. Thus, Taylor's testimony favors EDDO's argument that the Contracts did not terminate before August 25, 2006.

## C. Summary of Reasons that the Contracts Did Not Terminate Prior to August 25, 2006

The Contracts did not terminate prior to August 25, 2006. First, correspondence between Eagle and Hallwood from August 14 to August 25 presumes that the Contracts were still in effect on these dates. Intuitively, the Contracts cannot have terminated during this period if both parties continued to present to each other their differing interpretations of its various sections. Second, applying Oklahoma's standard for contract termination and the Contracts' termination clauses, the Court finds that communications between the parties (as evidenced by the exhibits discussed herein) indicate that the Contracts did not terminate before August 25, 2006. The Court has considered seven emails (four from Hallwood and three from Eagle) sent between August 14 and August 21. Not one email meets *Fortinberry*'s "clear and unequivocal

repudiation" standard for contract termination. Further, not one of Hallwood's emails indicates either the intention to invoke, or the actual invocation of, the Contracts' 6.3(b) termination clause. This Court has also considered Hallwood's Morning Report and the Deposition of Hallwood's operation superintendent. Again, neither document indicates Hallwood's invocation of the Contracts' 6.3(b) termination clause.

Therefore, the Court concludes that the Contracts were not terminated before Eagle's contract rights were assigned to EDDO on August 25, 2006. Because the Contracts were not terminated, Eagle assigned to EDDO live contracts, and any receivables arising from the Contracts thereafter are owned by EDDO, not Eagle.

## X.    Classification of Eagle's Claim Against Hallwood

Even if the Contracts terminated before August 25, 2006, the rights Eagle seeks to reserve pursuant to the Assignment—rights to recover for Hallwood's termination of the Contracts—are not accounts receivable; therefore, the claim is solely EDDO's property. EDDO's position that these rights are not accounts receivable is well supported by (1) Texas common law definitions of "account receivable," (2) Texas courts' interpretation of UCC Article 9's definitions of "account" and "general intangible," and (3) U.S. Federal Claims jurisprudence incorporating definitions of "account receivable" from GAAP, FASB, and an accounting textbook. Additionally, Eagle's attempt to replace Texas law with Oklahoma law as governing the Assignment is unpersuasive and unfounded, as the claim against Hallwood would not be classified as an account receivable under Oklahoma law.

41

**A. Eagle's argument that Oklahoma law governs the Assignment is unpersuasive.**

Although the Assignment is governed by Texas law pursuant to its choice of law clause[31] and the Contracts are governed by Oklahoma law pursuant to their provisions, Eagle submits that both should be governed by Oklahoma law. Eagle argues that, since the Assignment conveyed to EDDO Oklahoma-governed contracts, EDDO consented to Oklahoma governance of the Assignment by executing the Assignment.

To support this proposition, Eagle cites *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313 (5th Cir. 1992). However, this case undermines, rather than supports, Eagle's position. First, the Fifth Circuit expressly declined to address the choice of law exception relied on by Eagle. *Northpark*, 958 F.2d at 1318 n.6 ("We do not address this exception here."). Second, the Fifth Circuit upheld the district court's refusal to apply Mississippi law in contravention of a contract's choice of law clause. Finally, *Northpark* highlights that the more flexible approach to choice of law proposed by Eagle is the exception, rather than the rule. *Id.* Eagle has failed to adduce sufficient testimony to convince this Court that the exception, rather than the general rule, applies in this instance.

Eagle's argument under *Berg Chilling Systems v. Hull Corp.*, 435 F.3d 455 (3rd Cir. 2006) is also unconvincing. First, while Eagle contends that *Berg* allows a more flexible approach to choice of law issues when issues of state substantive law are at stake, Eagle does not directly address what issues of state law are applicable in this case. Second, Eagle points out the practical impossibility for Eagle and EDDO to make a choice of law decision relating to contracts between Eagle and Hallwood. This argument is wholly unpersuasive. Because the

---

[31] The Assignment is Eagle's Exhibit 11. The Assignment's paragraph 11 is entitled "Choice of Law" and reads: "This Assignment shall be governed and construed under the laws of the State of Texas."

Assignment was a wholly separate contract from the Contracts, the parties to the Assignment neither needed, nor were attempting, to address choice of law issues in the Contracts.

For all these reasons, this Court concludes that Texas law governs the Assignment.

## B. Application of Texas law

Eagle's own characterization of accounts receivable under Texas common law indicates that the contract termination claim passed to EDDO via the Assignment. Eagle concedes that there may not be an actual conflict between Oklahoma and Texas law as to the definition of account receivable. After noting that "account" is generally construed to include "accounts receivable," Eagle lists many Texas common law characterizations of accounts receivable. In each characterization, an account receivable denotes a right to payment because that payment is *owed*.[32] However, pursuant to Subsection 27.14 of both Contracts, the unpaid invoices that eventually led to contract termination (Invoices 261 and 262, dated August 25, 2006 and August 28, 2006, respectively) were due no earlier than September 1, 2006. Thus, these invoices could not constitute accounts receivable as of August 25, 2006, the Assignment's effective date, because they were not yet *owed* to Eagle (even under Eagle's characterization of accounts receivable). Since they did not constitute accounts receivable on the effective date of the Assignment, the right to payment from those invoices passed, via the Assignment, to EDDO along with any derivative claims arising therefrom (e.g., the contract termination Claim).

---

[32] Eagle uses the following characterizations of "account receivable" on pages 2 and 3 of Eagle's Listing of Additional Authorities: First, "sums *owing* under construction contracts" (quoting *South Main Bank v. State*, 365 S.W.2d 946 (Ct. App.—Austin 1963)) (emphasis added). Second, "nothing more than a debt *owing*" (quoting *Chester v. Jones*, 386 S.W.2d 544 (Ct. App.—Tyler 1965)) (emphasis added). Third, rights for services rendered "by the debtor that create a debt *owing* to the debtor by another party." (quoting *Texas Oil & Gas v. U.S.*, 466 F.2d 1040, 1050 (5th Cir. 1972)) (emphasis added). Fourth, that an account receivable reflects a "balance *owed* by a debtor to a creditor; a debt *owed* by a customer to an enterprise for goods or services." (quoting *Black's Law Dictionary* (8th Ed. 2004)) (emphasis added).

Texas law also suggests that Eagle did not retain claims against Hallwood as excluded accounts receivable under §5 of the Assignment. Citing *Sadler*, EDDO contends that damages for breach of contract do not constitute accounts receivable. *Sadler v. Pure Oil*, 173 S.E. 640, 641 (S.C. 1934). Texas common law defines accounts receivable as "contractual obligations owing to a person on an open account"; EDDO notes that damages resulting from termination of a written contract cannot constitute accounts receivable. *Chester v. Jones*, 386 S.W.2d 544, 547 (Tex. App.—Tyler 1965, writ dism'd by agr.); *Clifton v. Am. Express Centurion Bank*, No. 09-06-283 CV, 2007 WL 2493517, at *1 n.2 (Tex. App.—Beaumont Sept. 6, 2007, no pet.).

Responding to Eagle's position that the Article 9 definition of accounts receivable should govern, EDDO argues that the Assignment does not fall within Article 9 because it was not secured by any security, guaranty, or lien. EDDO contends that the relevant term is not "accounts receivable" (classified as an "account" under the UCC), but rather "general intangible," defined as a "bundle of rights such as those inherent in a franchise, [or] a chose in action." *See In re Newman*, 993 F.2d 90, 93 (5th Cir. 1993). EDDO also notes that the common law interpretation of Article 9 treats a cause of action as a "general intangible" and not an "account." *See In re Slippery Rock Forging, Inc.*, 99 B.R. 679, 681 (Bankr. W.D. Pa. 1989). Thus, since the rights Eagle seeks to reserve pursuant to the Assignment (i.e. the claim against Hallwood) constitute a cause of action, they are properly classified as a general intangible, and *not* an account receivable under Texas law. This Court agrees.

## C. Alternative Application of Oklahoma Law

Even if Oklahoma law applies, Eagle will not be able to reserve rights to the claim against Hallwood because these rights still are not accounts receivable. In *Utica*, an "account" is distinguished from a "contract right" and defined as "any right to payment for goods sold—a

44

right earned by performance regardless of whether payment be due." *Utica Nat'l Bank and Trust Co. v. Associated Producers Co.*, 622 P.2d 1061, 1064 (Okla. 1980). *Utica*'s distinction of "account" from "contract right" vitiates Eagle's attempt to reserve rights to the claim against Hallwood via the Assignment. The contract termination rights that Eagle seeks to reserve fit squarely under the category of "contract rights" under Oklahoma law. Accordingly, Eagle's purported rights to the claim cannot be classified as account receivables under Oklahoma law.

### D. Application of the Uniform Commercial Code

Under Article 9 of the UCC, the definitions of "account" and "general intangible" are identical in Oklahoma's and Texas's latest statutory adoptions of the UCC. *See* Okla. Stat. 12A, § 1-9-102(2)(A); Okla. Stat. 12A, § 1-9-102(42); Tex. Bus. & Com. Code § 9.102(2); Tex. Bus. & Com. Code § 9.102(42). Eagle may note that the definition of "general intangible" in EDDO's brief[33] differs from the definition of "general intangible" used in Texas's and Oklahoma's latest statutory adoptions of the UCC. The difference is that EDDO's definition includes "payment *rights* and software," whereas the latest UCC definition "includes payment *intangibles* and software." U.C.C. § 9.102(42) (emphasis added). This distinction, however, does not render EDDO's definition unusable. Because a "right" is by definition intangible, the phrases "payment right" and "payment intangible" may be used interchangeably.

### E. Other Relevant Case Law

EDDO finds further support for its position by pointing to a United States Federal Claims Court decision using definitions of "accounts receivable" from GAAP, FASB, and an accounting textbook. *Emerald Coast Finest Produce Co. v. United States*, 79 Fed. Cl. 459 (2007). In

---

[33] In its brief, EDDO cites to an older version of the Texas and Oklahoma statutes defining "general intangible" as "any personal property including things in action other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, oil, gas, or other minerals before extraction. The term includes payment rights and software."

*Emerald*, plaintiff's characterization of a lawsuit as an account receivable was rejected. The court reached this conclusion based on observations that a lawsuit is a contingency, while an account receivable is not.

The court in *Emerald* found that a lawsuit is a contingency by considering GAAP and FASB definitions. FASB, the resource linked at the top of the GAAP hierarchy, generally does not address treatment of a lawsuit within a company's financial statements in which that company is a plaintiff. *Id.* at 473. FASB does address, however, a defendant company facing "pending litigation or the threat of a suit." *Id.* This sole mention of litigation in FASB appears in the chapter entitled "Accounting for Contingencies" *Id.* Because FASB defines "contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible gain . . . or loss," and because the FASB lists "pending or threatened litigation" as a "loss contingency," the *Emerald* court concluded that a lawsuit is a contingency. *Id.*

The court in *Emerald* also found that an account receivable is *not* a contingency by considering three accounting sources to determine the relationship between an "account receivable" and a "contingency." The court focused on one textbook's definitions of "account receivable" and "current asset." The textbook defines "accounts receivable" as "amounts owed to the entity by its customers" and categorizes accounts receivable as "current assets." *Emerald*, 79 Fed. Cl. at 473. Current assets are "cash and other assets reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the entity or within one year, whichever is longer." *Id.* (quoting Robert N. Anthony & James S. Reece, *Accounting Principles* 34 (5th ed. 1983)). Noting that an account receivable is a current asset expected to be realized within a year, whereas a contingency may never occur, the court concluded that an account

46

receivable cannot be a contingency. *Id.* Further, the court noted that it would be inconsistent with GAAP to consider a lawsuit an account receivable. *Id.*

This Court finds *Emerald* persuasive. The claim against Hallwood is not an account receivable. First, Eagle's argument that Oklahoma law governs the Assignment is unpersuasive even under the case law relied on by Eagle. Thus, Texas law, the choice of law provided for in the Assignment, applies. The Texas cases cited by Eagle also establish that the claim cannot be properly classified as an account receivable because these cases characterize accounts receivable as *owed*, whereas here the unpaid invoices giving rise to the claim were not owed prior to execution of the Assignment. The cases cited by EDDO further weaken Eagle's position because those cases hold that damages for breach of contract cannot constitute accounts receivable.

Second, Eagle's attempts to justify its interpretation of "accounts receivable" under Article 9 are insupportable. Article 9 is inapplicable because the Assignment was never secured by any security, guaranty, or lien; but even if Article 9 applied, a cause of action is classified as a "general intangible," which is mutually exclusive from an "account."

Third, even if Oklahoma law applies, Eagle's purported rights to the contract termination claim still do not constitute an account receivable because, under *Utica*, a "contract right" cannot be classified as an account receivable. Additionally, both the Oklahoma and the Texas statutory adoptions of the UCC use identical language for the definitions of "account" and "general intangible."

Finally, *Emerald*'s holding that a lawsuit cannot be an account receivable lends further support to EDDO's position.

47

## XI.    Conclusion

For the foregoing reasons, this Court concludes that Eagle's arguments are unpersuasive and that EDDO's Motion should be granted.

An order consistent with this Opinion will be entered on the docket simultaneously herewith.


Signed on this 24th day of September, 2008.


Jeff Bohm
United States Bankruptcy Judge